[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 25, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13162

_____

D. C. Docket No. 98-00020-CV-CDL-4

WALTER H. ADAMS, individually, and on behalf
of all others similarly situated,

Plaintiff,

versus

SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY,
a Mississippi Corporation,

Defendant-Intervenor-
Defendant-Appellee,

HARMON JOURDAN, a plaintiff in pending litigation
in Mississippi case,
RONNIE CARLISLE, a plaintiff in pending litigation
in Mississippi case,
KIMBERLY CARLISLE, a plaintiff in pending litigation
in Mississippi case,
CECILE BARNETT, a plaintiff in pending litigation
in Mississippi case,
WILLIAM HATHCOCK, a plaintiff in pending litigation
in Mississippi case,
DAVID LYONS, a plaintiff in pending litigation
in Mississippi case,
ROY HODGES, a plaintiff in pending litigation

in Mississippi case,
DONNIE SMITH, a plaintiff in pending litigation in
Mississippi case,
WILSON CRAIG, a plaintiff in pending litigation in
Mississippi case,
ELIZABETH CRAIG, a plaintiff in pending litigation in
Mississippi case,

Respondents-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

**(July 25, 2007)**

Before EDMONDSON, Chief Judge, and BIRCH and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

In this case, we must determine whether the district court acted properly in concluding that the appellants–a group of plaintiffs alleging claims against appellee Southern Farm Bureau Life Insurance Company ("Southern Farm") in proceedings in Mississippi–are barred by the doctrine of res judicata from bringing their action, due to a consumer class action settlement in an earlier suit against Southern Farm. After the appellants brought their complaints in Mississippi state court in October 2005, Southern Farm filed a Motion to Enforce Final Judgment in the Middle District of Georgia. Southern Farm argued that the settlement, release,

2

and judgment that had been entered by the district court in an earlier 1999 consumer class action–in which the appellants were class members–barred the appellants' pending claims. The district court agreed, and, accordingly, it enjoined the appellants from further prosecuting their claims in Mississippi. This appeal followed. Upon review, we conclude that: (1) the notice afforded the appellants in the 1999 class action settlement satisfied the constitutional requirements of due process; and (2) the claims that the appellants have brought against Southern Farm in Mississippi plainly fall within the scope of the earlier class action settlement and release, and, therefore, they are barred by the doctrine of res judicata. Accordingly, we AFFIRM.

## I. BACKGROUND

A. The Adams Class Action and Settlement

In January 1998, Walter H. Adams brought an action, on behalf of himself and all others similarly situated, against Southern Farm in the Middle District of Georgia ("the Adams Class Action"). The Adams complaint was generally based on the allegation that Southern Farm had engaged in fraudulent and deceptive conduct in connection with the marketing and sale of flexible premium and universal life insurance policies to its customers.[1] The complaint alleged that,

---

[1] Flexible premium and universal life insurance policies are insurance products that were created by the insurance industry when interest rates increased dramatically in the 1980s and

3

beginning in 1984, Southern Farm had engaged in a scheme to

> fraudulently induc[e] existing policyholders to replace their existing
> policies in order to purchase new policies, without adequately
> informing the policyholders that by doing so they would lose
> substantial cash values, pay new and significant commission charges,
> and, if they lived beyond a certain age, pay significantly greater
> premiums, and/or be forced to accept less insurance or have their
> insurance lapse.

R1-1 at 5.

More specifically, the Adams complaint alleged that Southern Farm had
engaged in a number of deceptive and misleading sales tactics in selling flexible
premium and universal life policies, including, among others: misrepresenting the
benefits of the new policies; failing to provide an adequate explanation of concepts

---

policy holders began to convert their whole life policies to term insurance, in order to access the
cash value that had accumulated within their policies and seek higher rates of return through
alternative investments. See generally Daniel R. Fischel & Robert S. Stillman, The Law and
Economics of Vanishing Premium Life Insurance, 22 Del. Corp. L. J. 1, 4-6 (1997). To address
their declining market share, insurance companies developed flexible premium and universal life
insurance policies, both of which are "interest sensitive" policies that pay dividends based on
current interest rates. Id. at 4-8.

    With these policies, the premium that a policy holder was scheduled to pay was based on
certain market assumptions–specifically, the assumption that interest rates would remain high
over the life of the policy. Id. These policies were founded on the expectation that the cash
surplus accrued from premiums paid in the early years would earn enough to pay the premium in
the later years. Id.

    When interest rates fell, however, the cash value of many of these policies failed to grow
as assumed in the company's initial interest rate/dividend projections. As a result, many policy
holders were forced to pay significantly higher premiums than they had originally anticipated (or
risk losing the policy altogether). This development has resulted in a panoply of lawsuits against
the insurance industry, alleging that customers were deceived by the insurance companies based
on their misleading illustrations about how the policy would perform and their unreasonably
high projections of future interest rates. See id.

4

such as the policy's "cash value" and the "premium" required by the policy; and "employing performance projections based on unreasonable explanations concerning interest rates and misrepresenting and/or omitting adequate explanation of the consequences of less favorable performance." Id. at 5, 7.[2] The complaint asserted counts for breach of fiduciary duty, fraud, negligence, breach of contract, and breach of the duty of good faith and fair dealing. Adams sought relief for himself and all other class members similarly situated.

Southern Farm denied the allegations of the Adams Class Action. Following discovery, the parties entered into a Stipulation of Settlement. For purposes of the settlement, the proposed "class" was defined as "those persons and entities who currently own, or have owned, one or more flexible premium or universal life insurance policies [] issued between January 1, 1983 and March 24, 1999 by [Southern Farm] to replace other life insurance policies." R5-147, Exh. 1 at 5.

---

[2] The Adams Class Action was one of many that were brought in our circuit against the insurance industry in the late 1990s, based on allegedly deceptive conduct in the sale and marketing of flexible premium and universal life insurance policies. The allegations of each of these class actions are similar. See, e.g., Garst v. Franklin Life Ins. Co., No. 97-C-0074-S, 1999 U.S. Dist. LEXIS 22666, at *14-15 (N.D. Ala. June 28, 1999) (detailing a complaint alleging that the defendant "induced policyowners to believe that only a fixed number of out-of-pocket premium payments would be necessary" and that it engaged in "a widespread practice to sell replacement life insurance policies to existing and prospective policyowners"); Elkins v. Equitable Life Ins. Co., No. 96-196-CIV-T17B, 1998 U.S. Dist. LEXIS 1557, at *7-8 (M.D. Fla. Jan. 28. 1998) (detailing a complaint alleging that "defendants misled Class Members into believing that their life insurance policies would remain in force after payment of a single out-of-pocket premium or a fixed or limited number of out-of-pocket premiums" and that defendants "misled Class Members to believe that the dividend scales and interest rates illustrated at the time their policies were sold were reasonable [and] not likely to change").

5

After the district court approved the proposed settlement and preliminarily certified the class for settlement purposes, a class notice was sent to each reasonably identifiable class member in May of 1999. A total of 174,343 class notices were sent out, via first class mail, to each class member's last known address. In addition to the mailings, Southern Farm created a toll-free telephone number to field inquiries about the Adams Class Action; it published notice in USA Today; and it posted information about the Adams Class Action and the settlement on the Southern Farm website.

The class notice–which all of the appellants received–was 48 pages in length, and was written in a "Q & A"-type format. The notice indicated that it had been sent because the recipient was believed to be included the class of "current and former flexible premium or universal life insurance policyowners [who were] eligible to participate in the proposed settlement." R5-147, Exh. 1 at 1. The opening pages of the notice stated that the Adams Class Action "involv[ed] claims about how flexible premium and universal life insurance policies have been sold and how those policies have performed." Id. More specifically, in a section entitled "Description of the Lawsuit," the notice advised that the Adams Class Action concerned allegations that Southern Farm had "made misrepresentations or omissions of fact in connection with the sale of flexible premium and universal life

6

insurance policies," including, among other allegations:

> misleading policyowners to believe that only a single or fixed, limited number of out-of-pocket premium payments would be required to keep a policy in force, and that the promised death benefits and increasing or stable cash values would continue to exist, without the policymaker making any further out-of-pocket premium payments;

> misleading policy owners to believe that interest rates illustrated at the time the policies were sold to Class Members were reasonable, and that such rates were not likely to change, or would not change in an amount sufficient to cause the policies to perform differently than was represented at the time of sale.

Id. at 21.

The notice stated that two forms of relief were available to class members who participated in the Adams Class Action settlement: general relief, and special adjudication relief. For the former, class members were eligible for a "premium credit" towards the purchase of any Southern Farm life insurance policy or annuity, to be used within 12 months of the final settlement. As to the latter, class members who believed that Southern Farm had made direct misrepresentations to them concerning: the operation and performance of their policy; "the number, amount, and frequency of premium payments would affect the cash value"; or the ability to keep the policy in force "based on a fixed number or amount of premium payments" were entitled to elect special adjudication relief. Special adjudication relief consisted of an individualized review by Southern Farm's "claim review

7

team," and, if eligible, special relief in the form of an enhancement of the cash value of the claimant's existing policy. Id. at 30-33.

The notice also stated that putative class members would be automatically included in the proposed settlement with Southern Farm, unless they took the affirmative step of opting out. The notice advised that a settlement hearing had been proposed for 15 July 1999, and stated that once the proposed settlement had been approved by the district court, each class member would receive a second notice offering them an opportunity to participate in the settlement.

Pertinent to the present appeal, the class notice stated that all class members who failed to opt out or object to the settlement would be "bound by the orders and judgments entered by the court, whether favorable or unfavorable to the class," and that class members would "not be able to maintain, continue, or commence any other claim, lawsuit, or proceeding against [Southern Farm] relating to any [flexible premium or universal life] policy." Id. at 20. Section 5 of the class notice, entitled "Dismissal and Release of Claims," stated in bold that once the Adams Class Action was settled, the claims alleged against Southern Farm would be dismissed and "[n]one of those claims [could] thereafter be asserted by class members who remain[ed] in the Class in any other lawsuit or proceeding." Id. at 35. Section 5 stated that class members who participated in the settlement would

release Southern Farm from "liability for known and unknown claims relating to the [p]olicies," id., and Section 10 detailed that, upon approval of the settlement, the district court would enter a permanent injunction, barring any class member from filing, prosecuting, or participating "in any lawsuit . . . based on or relating to the claims and causes of action or the facts and circumstances relating thereto." Id. at 41.

Finally, appended to the class notice was an five page document entitled "Release and Waiver," which had been flagged in the "Q & A" section of the class notice; the text of the class notice indicated, in bold: "[y]ou should read [the Release] very carefully, because it will affect your rights if you remain in the Class." Id. at 35. The Release stated, in pertinent part, that all class members who were not excluded from the class would be barred from "now or hereafter institut[ing], maintain[ing], or assert[ing]" against Southern Farm any causes of action "that have been, could have been, may be, or could be, alleged or asserted now or in the future by Plaintiff or any Class Member against [Southern Farm] . . . in any other court action . . . on the basis of, connected with, arising out of, or related to, in whole or in part, the Released Transactions. . . . " Id. at 45. This included any future causes of action based on

> (1) any or all of the acts, omissions, facts, matters, transactions, or occurrences that have been, could have been, or were directly or indirectly

9

alleged, asserted, described, set forth, or referred to in [the Adams Class Action];

(2) any or all of the acts, omissions, facts, matters, transactions, [or] occurrences, sales presentations, illustrations, or any oral or written statements or representations allegedly made in connection with or indirectly or directly relating to the Released Transactions, including, without limitations, any acts, omissions, facts, matters, transactions, occurrences, or oral or written statements relating to:

> (a) the number of out-of-pocket payments that were paid or would need to be paid for any life insurance policy or the [flexible premium or universal life policies] . . .
> (b) the ability to keep or not to keep the Policy or the Policies in force based on a fixed number and/or amount of premium payments. . .
> (g) the relationship between the Policy's or Policies' cash value or cash surrender value and the cumulative amount, number, and/or frequency of premiums paid;

Id. at 45-46.

The last page of the release stated that "the Class Members acknowledge that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true with respect to the matters released herein." Id. at 48. Nevertheless, the release indicated that participating class members agreed to release Southern Farm from all claims "which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action)." Id.

In August 1999, a Fairness Hearing was held in connection with the proposed Adams Class Action settlement. The district court found that class certification was proper under Fed. R. Civ. P. 23, that the notice that had been

10

provided to the class "was adequate, comprehensive, and timely," R3-89 at 40, and that the proposed settlement was fair, adequate, and reasonable. In light of those findings, the district court entered a Final Order and Judgment, in which it adopted and incorporated by reference the terms of both the settlement and the release. The court also entered a permanent injunction "barr[ing] and enjoin[ing]" all class members who had not opted out of the settlement from "filing, commencing, prosecuting, intervening in, or participating in (as class members or otherwise) any lawsuit in any jurisdiction based on or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this action and/or the Released Transactions. . . ." R3-90 at 9. The court retained jurisdiction as to all matters concerning the enforcement of the class action settlement as well as the court's Final Order and Judgment.

After the district court issued its Final Order, a second notice, entitled "Notice of Approval of Settlement and Opportunity to Elect Relief" was sent to all members of the class, advising them of the terms of the final settlement and the types of relief that were available to them. The second notice advised its recipient class members that, regardless of whether they elected to pursue to proposed relief, they would be "bound by all of the terms of the Settlement Agreement, including being precluded from pursing any claims or matters covered by the Settlement

11

Agreement in any pending or future lawsuits or other proceedings." R5-147, Exh. 3 at 4. The second notice also made clear that, under the terms of the settlement, all class members who did not opt out of the Adams Class Action were permanently enjoined from commencing "any lawsuit in any jurisdiction based on or relating to the claims and causes of action or the facts and circumstances thereto in the class action lawsuit or in the Released Transactions." Id. at 10. As with the first notice, it is not disputed that the appellants received this follow-up notice. None of the appellants, however, opted to pursue the relief provided in the Adams Class Action settlement.

B. The Appellants' Mississippi Claims

In October 2005, over six years after entry of the district court's Final Order and Judgment in the Adams Class Action, the appellants filed two separate actions against Southern Farm in Mississippi state court.[3] The two complaints were nearly identical to each other. Both alleged that Southern Farm had engaged in deceptive and fraudulent practices in recommending replacement life insurance products such as flexible premium and universal life insurance policies, without disclosing

---

[3] One action, Harmon Jourdan et. al. v. Southern Farm Bureau Life Ins. Co., No. 251-05-932 CIV, ("the Jourdan Complaint"), was filed in Hinds County Circuit Court, Mississippi and was subsequently removed to the Southern District of Mississippi. The other, Wilson Craig v. Southern Farm Bureau Life Ins. Co., No. CV-05-360-PFM, ("the Craig Complaint"), was filed in Monroe County Circuit Court, Mississippi. Both actions are still pending.

12

that the premiums for these policies could increase over time. Specifically, the appellants' complaints alleged that Southern Farm had marketed its replacement polices as having "level and/or limited" premiums, without disclosing that the premium payments might increase if the interest rates assumed by Southern Farm's models did not remain as high over time as projected. See Jourdan Compl., Br. Of Appellants, Exh. 1 at 8.

The Jourdan and Craig Complaints also alleged that Southern Farm had failed to explain key concepts such as "cash value" and how it would affect their policies, and that Southern Farm had failed to explain how the cash value of the appellants' policies would go down if interest rates fell in the future (thereby resulting in higher premium payments). The gravamen of the appellants' complaints was the general allegation that Southern Farm had fraudulently and deceptively suggested to its customers that the premium payment would be "level [in amount] and/or limited in number," and that this suggestion had prompted the appellants to purchase replacement policies without being informed of the actual risks of those policies. See id. at 36. Both complaints alleged a total of 13-counts against Southern Farm, including, inter alia, fraudulent misrepresentation, breach of contract, negligence, fraud, and breach of fiduciary duty.

In December 2005, Southern Farm filed a Motion to Enforce Final Judgment

13

with the district court, seeking to permanently enjoin the appellants from prosecuting the Jourdan and Craig actions pending in Mississippi. Southern Farm contended that the district court had authority under the All Writs Act, 28 U.S.C. § 1651(a),[4] to enjoin the appellants' actions, and contended that the pending actions were plainly violative of the settlement, release, and judgment that had been entered by the district court in the Adams Class Action. Southern Farm asserted that the appellants were members of the class; that they had each been afforded notice of the Adams Class Action; and that none of them had taken steps to opt out of the Adams Class Action.

Moreover, Southern Farm contended that the claims being asserted in the Jourdan and Craig Complaints were nearly identical to the claims that had been settled and released by State Farm in the Adams Class Action, based, as they were, on Southern Farm's allegedly deceptive practices in connection with the sale of flexible premium and universal life insurance policies. Southern Farm argued that issues such as (1) the amount and number of premiums that would be required with the policies; (2) the failure to disclose the relationship between interest rates, the

---

[4] The All Writs Act, 28 U.S.C. § 1651(a), provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Under this statute, the Supreme Court "has repeatedly recognized the power of a federal court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." United States v. N.Y. Tel. Co., 434 U.S. 159, 172, 98 S. Ct. 364, 372 (1977).

14

cash value, and the premium payment; and (3) misrepresentations about how the policies would perform had *all* been litigated, settled, and released in the Adams Class Action. Noting the myriad similarities between the allegations of the Adams Class Action and those of the Jourdan and Craig Complaints, Southern Farm argued that the appellants' actions were plainly barred by the terms of the settlement, release, and judgment that had been entered by the district court.

The district court agreed. After first finding the notice that had been provided to the appellants in the Adams Class Action was adequate, thorough, and comported with both the requirements of due process and the requirements of Rule 23, the court concluded that the claims the appellants had brought in Mississippi "[arose] out of the same [universal life] policies and [r]eplacement [t]ransactions that were the subject of the class action settlement approved by [the] Court in 1999." R7-157 at 10. Specifically, the court found that the Jourdan and Craig Complaints had alleged a scheme to defraud insurance policyholders by convincing them to switch to replacement policies; by misrepresenting the amount and number of premiums that would be required; and by failing to disclose the effect that interest rates might have on the cash value of the policy. Observing that all of these allegations mirrored those of the Adams Class Action, the court concluded that they were barred by the settlement and release that had been entered into by

15

Southern Farm and had been approved by the district court via the court's Final Order and Judgment. Accordingly, the court issued an order permanently enjoining the appellants from further prosecuting their actions against Southern Farm in Mississippi. This appeal followed.

## II. STANDARD OF REVIEW

"In reviewing the district court's decision to grant an injunction, including an injunction under the All Writs Act, we apply an abuse-of-discretion standard." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004) (citation omitted). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1336 (11th Cir. 2003) (per curiam) (citation and quotation omitted). In making these assessments in the context of a decision to grant an injunction, we review the district court's factual determinations for clear error, and its purely legal determinations de novo. Klay, 376 F.3d at 1097 (citations omitted).

## III. DISCUSSION

The appellants' argument on appeal is essentially two-fold. First, they contend that the original class notice that was afforded to them in connection with

16

the Adams Class Action was constitutionally inadequate.  Second, they contend that the type of claims asserted in their actions in Mississippi–based upon so-called "increasing premium" policies–are distinguishable from the claims against Southern Farm that were settled and released in the Adams Class Action.  Because, they contend, their "increasing premium" actions do not fall within the scope of the 1999 Adams Class Action settlement and Release, they assert that the doctrine of res judicata should not preclude them from prosecuting those actions in Mississippi.  We address each contention in turn.

A.  Whether the Notice in the Adams Class Action Comported With Due Process

Although the ultimate question in this case is whether the Adams Class Action settlement and release should have a res judicata effect on the appellants' present actions, we have stated that res judicata can only be applied to an action if it is first shown that doing so would be consistent with due process.  Twigg v. Sears & Roebuck & Co., 153 F.3d 1222, 1226 (11th Cir. 1998).  The appellants argue on appeal that the Adams Class Action notice was constitutionally inadequate, and that, consequently, permitting the Adams Class Action to have a res judicata effect would not be consistent with due process.  Id. at 1228-29.  Thus, at the outset, we address whether the notice that was provided to appellants in the 1999 Adams Class Action comported with due process.

17

"[C]lass actions, as other cases, are subject to the requirements of due process." Id. at 1226. "The essence of due process is that deprivation of life, liberty, or property by adjudication be preceded by *notice* and opportunity for a hearing appropriate to the nature of the case." In re Nissan Motor Corp. Antitrust Litig., 552 F.3d 1088, 1103 (5th Cir. 1977) (citation and quotations omitted) (emphasis added). See also In re Gen. Am. Life. Ins. Co. Sales Practices Litig., 357 F.3d 800, 804 (8th Cir. 2004) (stating, in the context of a class action, that "[t]he most important element of due process is adequate notice."). Our predecessor circuit has stated that "[t]o satisfy this principle, it is not only necessary that the notice reach the parties affected but that it convey the required information." Nissan, 552 F.3d at 1103 (citations omitted). The notice sent to class members must inform them whether "claims like [theirs] were litigated in the [earlier] action." Twigg, 153 F.3d at 1228. In addition, the class members' "substantive claims must be adequately described [and] the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." Nissan, 552 F.3d at 1104-05. In reviewing the class notice to determine whether it satisfies these requirements, "we look solely to the language of the notices and the manner of their distribution." Twigg, 153 F.3d at 1227.

As to the substance of the class notice, the 48-page notice in the Adams Class Action–which all of the appellants received– contained a toll-free telephone number on both its first and second pages, along with the contact information for Southern Farm. Page one of the notice indicated that the recipient was "receiving this information because, according to [Southern Farm's] records, you are a member of the Class of current and former flexible premium or universal life insurance policyowners eligible to participated in the proposed settlement." R5-147, Exh. 1 at 1. It directed recipients to "[p]lease read all of the enclosed materials carefully to understand your rights under the proposed settlement and the decisions you need to make," id. at 2, and it encouraged them to call the toll free telephone number provided if they had questions.

The notice was written in a generally understandable, "Q & A"-type format. It advised recipients that the Adams Class Action "involv[ed] claims about how flexible premium and universal life insurance policies have been sold and how those policies have performed." Id. at 1. More specifically, the notice advised its recipients that the earlier Adams Class Action been based on allegations that Southern Farm had "made misrepresentations or omissions of fact in connection with the sale of flexible premium and universal life insurance policies." Id. at 21.

In addition to setting forth the two types of specific relief available to class

19

members, the notice stated that recipient class members would be automatically included in the proposed settlement with Southern Farm, unless they took the affirmative step of opting out. It also informed recipients that a Fairness Hearing had been scheduled for 15 July 1999 to assess the fairness of the proposed settlement. The notice indicated that once the proposed settlement had been approved by the district court, each class member would receive a second notice offering him or her an opportunity to participate in the settlement. Finally, the notice stated that all class members who failed to opt out of the settlement would be "bound by all orders and judgments entered by the Court, whether favorable or unfavorable to the Class," and that class members would "not be able to maintain, continue, or commence any other claim, lawsuit or proceeding against [Southern Farm] relating to any [flexible premium or universal life policy] if [they] decide[d] to remain in the Class." Id. at 20. Appended to the notice was the aforementioned Release and Waiver, which was identified as being "critical." Id. at 35. Recipients were urged to read the release "very carefully." Id.

As to the method of distribution employed, Southern Farm sent these notices to all identified class members' last known address, via first class mail. Each notice that was subsequently returned to sender was further investigated by Southern Farm in an attempt to obtain the correct address, and, where possible, a

20

second notice was sent to the corrected address. In addition to these mailings, the company also created a toll free telephone number to field inquiries about the Adams Class Action; it published notice in USA Today; and it posted information about the Adams Class Action its website.

The district court found that the notice provided to the appellants in this case was adequate and thorough, and that it comported with both the requirements of Rule 23 and of due process.[5] We agree. First, the notice was thorough, consisting as it did of 48-pages of explanatory text. Cf. Twigg, 153 F.3d at 1228-1229 (finding a two-page notice with a vague, one sentence description of the type of claim involved, to be violative of due process). Second, the language of the notice was clear and comprehensible, and it adequately described both the substantive claims at issue in the Adams Class Action and the "information reasonably necessary to make a decision to remain a class member and be bound by the final judgment," such as the relief available, the steps necessary to opt out, and the implications of remaining a member of the class. See Nissan, 552 F.3d at 1104-05. Finally, we find, as the district court did, that the steps taken by Southern Farm in distributing the notice–via multiple first class mailings and publication in a

---

[5] Our case law makes clear that Rule 23's mandate that absentee class members be given "the best notice practicable under the circumstances," Fed. R. Civ. P. 23(c), is consistent with the due process requirements of the Constitution, and, in fact, that Rule 23 goes beyond those requirements. Nissan, 552 F.2d at 1103-1104 (citation omitted).

national newspaper–as well as providing a telephone number, website, and mailing address to field queries from class members, constituted "the best notice practicable under the circumstances." See Fed. R. Civ. P. 23(c).

The appellants argue that their case is analogous to Twigg, in which we concluded that the notice afforded class members was insufficient because it did not adequately describe the type of claim involved in the earlier class action. Twigg, 153 F.3d at 1228-1230. In Twigg, the notice had indicated–in a pithy, one sentence description–that the class action involved "unnecessary and/or improper repairs" performed by the defendant, Id. at 1229-30, that is, repairs that were performed that were not needed. The appellant's action in a later suit, however, was based on services for which he had paid, but which had *not been performed*. Id. at 1224. Because we found that the notice in the earlier action had failed to advise the appellant whether "claims like his were being litigated [or] had been settled" in the earlier action, we concluded that permitting res judicata to bar the appellant's present claims would be inconsistent with due process. Id. at 1228-29.

The appellants seek to analogize their case to Twigg, because the notice in the Adams Class Action failed to mention the type of claim that they contend is involved in their case, that is, a claim based on an undisclosed "increasing

22

premium."[6]  Relying on Twigg, the appellants assert that it would violate due process to apply the terms of the Adams Class Action (including its release) to their action involving increased premiums.  As they explain, "[n]owhere in the [Adams] class action notice does it address 'increasing premiums' nor does it state that the class members' premiums could/would increase."  Br. of Appellants at 8.

Twigg is inapposite, however, because the notice contained in the Adams Class Action described in great depth the type of claims that were being litigated and settled in that case, and, unlike in Twigg, that description included the type of claims appellants are now seeking to bring.  Specifically, the Adams notice stated

_____

[6] The term "increasing premium" is a bit of a misnomer; there is no distinctly identifiable Southern Farm insurance product known as an "increasing premium policy."  In fact, the record suggests that the plaintiffs in this action had flexible premium policies.  See, e.g., Jourdan Policy, Br. of Appellants, Exh. 4 (identifying the policy as a "Flexible Premium Life Insurance Policy" and advising the policyholder that "premium payments are flexible," that "you may choose the amount and frequency of payments," but that the "amount . . . of premium payment will affect cash value").

As appellants conceded at oral argument, their policies were "increasing" only in the sense that if the policyholder paid a premium over time–based on overly-optimistic interest rate/dividend projections–and then interest rates decreased (resulting in a shortfall in the anticipated cash value of the policy), the policyholder would be left having to either increase the premiums to cover the policy, or risk losing coverage.  Under the appellants' flexible premium policies, they could voluntarily determine the amount of their monthly premium, but if they paid too little in the early years they could find themselves having to voluntarily increase their payments if interest rates (and the policy's dividends) decreased, or, otherwise, forego further coverage.  As is discussed subsequently, despite the branding of their case as one involving "increased premiums," the policies involved in appellants' case–and the alleged deception surrounding their sale and promotion–were strikingly similar to those involved in the Adams Class Action.  Compare R3-90 at 2-3 (defining the Adams class as all of those who had an ownership interest in "flexible or universal life insurance policies") with Jourdan Compl., Br. of Appellants, Exh.1 at 8 (stating that "Southern Farm [] fraudulently induced Plaintiffs to purchase their Universal policies" without explaining whether and how the premiums could increase on those policies").

23

that the Adams Class Action involved "misrepresentations or omissions of fact in connection with the sale of flexible premium . . . life insurance policies." R5-147, Exh. 1 at 21. This notice included allegations that Southern Farm had both misled policy owners about the number of premium payments that would be required to keep the policy in force and had indicated that its interest rate projections would not change in such a way to affect the performance of the policy. More specifically, the special adjudication portion of the notice informed class members that they were entitled to special relief if they believed Southern Farm had misrepresented "the manner in which the number, *amount*, and frequency of premium payments would affect the cash value [of their policies]." Id. at 30 (emphasis added).

This description informed the appellants of the types of claims being litigated in the Adams action, and, in addition, it made clear that the appellants' claims–which essentially are based on fraud in connection with the premiums to be paid on their policies and a failure to disclose the impact of declining interest rates on the cash value of those policies–would be subject to the Adams Class Action settlement. The fact that the notice did not specifically use the phrase "increasing premium" policies–assuming there is such a thing–does not render the notice constitutionally suspect for due process purposes, as the wording of the notice was

sufficient to encompass appellants' increasing premium-type of action.  See, e.g., In re Gen. Am. Life. Ins., 357 F.3d at 804-05 (finding no due process violation–where "modal billing practices . . . were never specifically at issue" but where the notice "was clearly broad enough to encompass such practices"–and concluding that "[t]here is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded").  We conclude that the notice afforded the appellants in the Adams Class Action constituted the best notice practicable and comported with the requirements of due process, and that the appellants' reliance on Twigg is misplaced.

B.  Whether The Settlement in the Adams Class Action Bars Appellants' Claims

Having determined that the notice afforded to the appellants in the Adams Class Action was adequate, we now must assess whether the settlement, release, and judgment entered in that earlier action should have a res judicata effect on the appellants' actions (that is, the Jourdan and Craig Complaints) currently pending in Mississippi.  Res judicata, or claim preclusion, will prohibit a party from re-litigating a claim where a judgment on the merits (involving the same claim and the same parties) exists from a prior action.  The principles of claim preclusion "apply to judgments in class actions as in other cases." Twigg, 153 F.3d at 1226 (citation omitted).  In order for claim preclusion to apply, four elements are

25

required: (1) a final judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) identity of the parties; (4) identity of the causes of action. Id. at 1225 (citation omitted). The first three elements are not disputed in the present case,[7] and therefore our analysis centers on whether the cause of action alleged by the appellants is identical to the cause of action that was settled in the earlier Adams Class Action. In determining whether the causes of action are identical, we have indicated that the analysis centers on whether the "primary right and duty are the same." Manning v. City of Auburn, 953 F.3d 1355, 1358 (11th Cir. 1992) (citations omitted). Claim preclusion applies "not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact." Id. at 1358-59 (citation and quotations omitted).

The appellants argue that their present actions involve so-called "increasing premium" insurance policies–that is, claims based on Southern Farm's failure to disclose that their policy premiums might increase in the event interest rates turned

[7] The district court's Final Order and Judgment in the Adams Class Action, adopting in full the terms of the settlement and enjoining the class members from pursuing any further lawsuits based on or relating to the facts of that case, constituted a final judgment on the merits that was rendered by a court of competent jurisdiction. In addition, it is undisputed that the parties in the present action are identical to those of the Adams Class Action; the appellants in this case are all members of the "class" that was certified in the Adams Class Action, that is, persons who had an ownership interest in a flexible premium or life insurance policy issued by Southern Farm as a replacement policy between 1983 and 1999.

26

out to be lower than those projected.  They contend that this is a different "operative nucleus of fact" than the claims asserted in the Adams Class Action, which, they argue, involved "vanishing premium" policies, that is, where the policy holder expected the premium to disappear once the cash value was large enough to cover the required premiums.  The appellants assert that there is a factual distinction between premiums that would suddenly increase without warning and premiums that failed to disappear after a period of time, such that claim preclusion should not apply.

We disagree.  First, although the appellants attempt to construe their claims as being based on "increasing premium" policies, it is clear that the policies involved in their case were *flexible* premium policies–identical to those that were the subject of the Adams Class Action–and were only "increasing" in the sense that the premium required to cover the policies might be greater if interest rates took an unforeseen downward turn.  The Adams Class Action notice, which was incorporated into the district court's Final Order and Judgment, alleged an overarching scheme of fraud and deception by Southern Farm in connection with the sale of these flexible premium types of policies, a broad nucleus of fact that would encompass the fraud claims now being alleged by the appellants. See In re Prudential Ins. America Sales Practice Litig., 148 F.3d 283, 311 (3d Cir. 1998)

27

("The named plaintiffs . . . all have claims arising from the fraudulent scheme perpetrated by Prudential. That overarching scheme is the linchpin of [the complaint], regardless whether each class member alleges a churning claim, a vanishing premium claim, an investment plan claim, or some other injury . . . ."); see also In re Gen. Am. Life Ins., 357 F.3d at 803-04 (finding that a broadly-worded class action settlement "clearly encompassed" the plaintiff's new claims alleging fraud in the sale of insurance policies, even though the settlement did not specifically mention modal billing practices).

Moreover, the notice stated that the Adams Class Action involved, among other allegations, the contention that Southern Farm had misrepresented "the manner in which . . . the *amount* . . . of premium payments would affect the cash value [of the policies]." R5-147, Exh. 1 at 30-31 (emphasis added). This explicit reference to the amount of the premium (and the fact that the amount could rise if the cash value was not as Southern Farm anticipated) belies the appellants' assertion that their claims are based on a different nucleus of operative fact than the Adams Class Action.

Finally, the release that was drafted in the Adams Class Action, which all of the appellants received, made clear that it was to be in settlement of any causes of action "that have been, could have been, may be, or could be alleged or asserted

28

now or in the future" by any class member, "on the basis of, connected, with, arising out of, or related to, in whole or in part," the subject transactions. Id. at 45-46. This language, which was expressly incorporated into the district court's Final Order and Judgment, clearly encompasses the appellant's pending claims. Because the appellant's so-called "increasing premium" claims are based on the "same operative nucleus of fact" as those settled and released in the Adams Class Action, see Manning, 953 F.2d at 1358-59, we agree with the district court that res judicata applies to those claims.[8] And because res judicata applies to the appellants' pending actions, the district court properly enjoined them from further prosecuting those actions in Mississippi.

## IV.  CONCLUSION

The appellants have appealed the district court's order granting Southern Farm's Motion to Enforce Final Judgment and enjoining the appellants from further prosecuting their actions against Southern Farm in Mississippi. Upon review, we conclude that the notice afforded the appellants in the Adams Class

---

[8] Nor are we persuaded by the appellants' contention that their claims are "future injury" claims, that is, that they had yet not been injured by Southern Farm at the time of the Adams Class Action settlement and release. A review of the appellants' complaint makes clear that the "injury" they suffered, if any, occurred with "the purchase of a product that was other than as represented." See Elkins, 1998 U.S. Dist. LEXIS 1557, at *50; see also In re Prudential, 148 F.3d at 313 (rejecting a similar future injury argument, and finding that "[t]here is no 'future' manifestation of injury, because any injury suffered by a member of the class has already occurred," through the insurer's allegedly fraudulent sales practices at the point of sale).

Action comported with the requirements of due process, and that the settlement, release, and Final Order and Judgment entered in the 1999 Adams Class Action precludes the appellants from bringing their actions against Southern Farm. Accordingly, we **AFFIRM.**