[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15395
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 28, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-21296-CV-FAM

M.D. KENNETH A. THOMAS, et al.,


                                                                    Plaintiffs,


                                    versus


BLUE CROSS and BLUE SHIELD ASSOCIATION,
et al.,


                                                                    Defendants,


BLUE CROSS AND BLUE SHIELD OF NORTH
CAROLINA,


                                                                    Defendant-Appellee,


JOSEPH G. JEMSEK, M.D.,
JEMSEK CLINIC, P.A.,


                                                                    Respondents-Appellants.

Appeal from the United States District Court

(May 28, 2009)

Before TJOFLAT, CARNES and PRYOR, Circuit Judges.

PER CURIAM:

Doctor Joseph G. Jemsek and his clinic appeal the district court's order permanently enjoining seven of his counterclaims against Blue Cross Blue Shield of North Carolina. The district court found that a recent class action settlement agreement and its judgment entered in <u>Love, et al. v. Blue Cross Blue Shield Ass'n, et al.</u>, No. 03-21296-CV (S.D. Fla. Apr. 19, 2008), effectively released Dr. Jemsek's claims. We affirm.

**I.**

The <u>Love</u> case was a nationwide class action filed in the United States District Court for the Southern District of Florida in 2003. Hundreds of thousands of doctors alleged that Blue Cross health insurance companies using "fee for service" arrangements had promised to reimburse them for services provided to patients insured by Blue Cross so long as the services were covered and medically necessary. However, Blue Cross instead decided to:

covertly deny[] payments to physicians based on financially expedient cost and actuarial criteria rather than medical necessity, process[] physicians' bills using automated programs which manipulate standard coding practices to artificially reduce the amount physicians are paid, and . . . systematically delay[] payments to gain extended use of the physicians' funds.

(Love Complaint, D.E. 1385 at 4). In short, the Love action alleged that Blue Cross cheated doctors by devising ways to delay, diminish, and deny properly requested payments based on their cost instead of medical necessity. In 2007 Blue Cross agreed to settle the case for $130,000,000 and an agreement to change many of its business practices. Most notably, Blue Cross agreed to use medical standards and scientific evidence in making its "medical necessity" determinations. The settlement agreement also included a release designed to prevent doctors who were members of the plaintiff class from pursuing further claims based on the same actions by Blue Cross.

Notices of the preliminary Love settlement were mailed to Dr. Jemsek and the Jemsek clinic in July 2007. A summary notice was also published in USA Today, the Wall Street Journal, the Journal of the American Medical Association, and the American Medical News. Neither Dr. Jemsek nor the Jemsek clinic opted out of the plaintiff class. Accordingly, they were bound by the settlement agreement when the district court issued its final approval in April 2008. The

3

district court's order enjoined Jemsek from bringing, against any Blue Cross

defendant, claims that:

> [A]re, were, or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances, or other matters referenced in the [Love] Action, or addressed in the Settlement Agreement, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons . . . . This includes, without limitation and as to Released Parties only, any aspect of any fee for service claim submitted by any Class Member.

(D.E. 1286, at 8–9).

Meanwhile, a separate lawsuit was underway in North Carolina between

Jemsek, his clinic, and Blue Cross. Dr. Jemsek and Blue Cross had entered into a

provider agreement in 2000. Dr. Jemsek then developed a practice that specialized

in the treatment of Lyme disease. In 2005, however, the North Carolina Medical

Board began investigating Dr. Jemsek on suspicion that he was over-diagnosing

Lyme disease and inappropriately treating his patients for it. Blue Cross then

notified Dr. Jemsek that it would no longer reimburse him for his Lyme disease

treatments, which included expensive long-term intravenous antibiotics.

Eventually Blue Cross dropped Dr. Jemsek as a provider and the medical board

restricted his medical license for one year.

4

Blue Cross then sued Dr. Jemsek and his clinic for fraud and breach of contract based on Jemsek's billing Blue Cross for his adventuresome Lyme disease treatments. Blue Cross sought $15,000,000 in damages— the total amount it paid Jemsek between 2000 and 2005 for Lyme disease treatments. Jemsek responded to Blue Cross' complaint by filing for bankruptcy for both himself and his clinic in the United States Bankruptcy Court for the Western District of North Carolina.

Once Blue Cross' case was removed to the North Carolina bankruptcy court in 2007, Jemsek filed nine compulsory counterclaims against Blue Cross. They were for breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, unfair and deceptive trade practices, fraudulent misrepresentation, negligent misrepresentation, defamation, and tortious interference with a business relationship.

In response to Jemsek's counterclaims, Blue Cross moved the Florida district court to enforce its final approval order in the Love settlement and enjoin Jemsek's counterclaims. The district court referred the matter to a magistrate judge. The magistrate judge found that seven of Jemsek's counterclaims (all but the defamation and tortious interference with a business relationship) arose from the same factual predicate as Love and thus were within the scope of the

settlement and should be enjoined. In September 2008 the district court adopted the recommendations of the magistrate judge and enjoined seven of Jemsek's counterclaims. This is Jemsek's appeal.

## II.

"In reviewing the district court's decision to grant an injunction . . . we apply an abuse-of-discretion standard." Adams v. S. Farm Bureau Life Ins. Co., 493 F.3d 1276, 1285 (11th Cir. 2007) (quoting Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004). We review the district court's purely legal determinations de novo. Adams, 493 F.3d at 1285.

## A.

The first issue is whether the Love settlement precludes Dr. Jemsek's claims against Blue Cross. In Adams we stated that claim preclusion applies to class actions just the same as to other types of lawsuits. 493 F.3d at 1289 (quoting Twigg v. Sears & Roebuck Co., 153 F.3d 1222, 1226 (11th Cir. 1998). "In order for claim preclusion to apply, four elements are required: (1) a final judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) identity of the parties; (4) identity of the causes of action." Adams, 493 F.3d at 1289.

In this case, as in Adams, the first three elements are not disputed. Id. It is clear that the Love action reached a final judgment on the merits, that the United

6

States District Court for the Southern District of Florida had jurisdiction, and that Jemsek, his clinic, and Blue Cross were all parties in the Love action. Therefore, our only question is whether "the cause of action" alleged by Jemsek is the same as the cause of action that was settled in the earlier Love class action. See Adams, 493 F.3d at 1289.

Jemsek asserts that Blue Cross must show an "identical factual predicate" underlying both the Love action and Jemsek's counterclaims in order for claim preclusion to apply. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 376–77 (1996) ("In order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action."). As Jemsek concedes, an "identical factual predicate" requires only a common nucleus of operative fact. Adams, 493 F.3d at 1289 ("Claim preclusion applies not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact.") (citation and quotation marks omitted). In determining whether claims share the "same operative nucleus of fact," we consider whether the "primary right and duty are the same." Id. at 1289 (quoting Manning v. City of Auburn, 953 F.2d 1355, 1358 (11th Cir. 1992)).

7

Jemsek's counterclaims in the bankruptcy case share the "same operative nucleus of fact" covered by the Love settlement. On a broad scale, the Love action alleged a nationwide conspiracy by Blue Cross licensees to diminish, delay, and deny proper claims for medically necessary procedures. The thrust of the Love action was that Blue Cross intentionally came up with various ways, especially using computer systems, to defraud doctors by refusing to pay for treatments that proved too costly, regardless of their medical necessity. The "primary right and duty" involved was Blue Cross' contractual duty to pay its doctors for medically necessary care given to its clients, and the doctors' contractual right to receive that money. See Adams, 493 F.3d at 1289.

Jemsek's individual claims are based on the same facts. Jemsek's seven counterclaims are fundamentally based on his allegation that Blue Cross breached its contract with him. That contract required Blue Cross to reimburse Jemsek for covered services that were medically necessary. Jemsek's claim is that Blue Cross failed to pay him "based on a desire to limit its costs." He asserts that Blue Cross denied his payment and eventually terminated his contract "not based upon medical evidence" but instead in order to avoid costly but effective treatments. (R.E. 1306, Exh. 3, at 27–29). Jemsek's seven enjoined claims included two breach of contract claims, quantum meruit (asking for the payment he never

8

received), fraudulent and negligent misrepresentation (based on his reliance on the expected payments from Blue Cross), unfair and deceptive trade practices, and breach of the implied covenant of good faith and fair dealing (based on the breach of contract and on its sudden termination).

Jemsek makes several attempts to distinguish the factual predicate of his claims from those in the Love action. First, he argues that, unlike in the Love action, Blue Cross cheated him personally and intentionally and that his claims do not allege a conspiracy. Yet Jemsek even pleaded that Blue Cross "and its affiliates" took similar positions and cut off payment for the treatment of Lyme disease in other states. Moreover, while Jemsek believes that he has a claim against only one Blue Cross licensee which he alleges has singled him out for mistreatment, it stands to reason that many doctors felt the same way before learning of the Love class action. That Jemsek's claims are in his mind unique to himself and to one state's Blue Cross licensee is not inconsistent with the Love action's claims on behalf of thousands of doctors against Blue Cross licensees nationwide.

Second, Jemsek argues that the Love action concerned surreptitious action to diminish the amount of payments owed to doctors, while his own allegations

9

involve up-front refusals to pay for treatment at all and the eventual cancellation of his provider status. Jemsek also argues that the Love action primarily addresses fraud undertaken through computer billing systems, a fact that is absent from his own claims.

However, the "primary right and duty" involved and violated is the same. Adams, 493 F.3d at 1289. Blue Cross had a duty to pay for medically necessary treatments and Jemsek, like the other doctors, had the right to collect those payments. The Love action's factual predicate broadly encompasses the facts underlying Blue Cross' systemic efforts to defraud doctors by denying, diminishing, or delaying payments on the basis of cost instead of medical necessity. Although only one part of Blue Cross' conspiracy involved its computer system, that same cost-cutting undertaking logically encompasses stopping all payments for expensive Lyme disease treatments even though no new medical evidence about Lyme disease had come to light. See, e.g., Adams, 493 F.3d at 1290 ("The Adams Class Action . . . alleged an overarching scheme of fraud and deception by Southern Farm in connection with the sale of these flexible premium types of policies, a broad nucleus of fact that would encompass the fraud claims now being alleged by the appellants."); In re Prudential Ins. America Sales Practice Litig., 148 F.3d 283, 311 (3d Cir. 1998) ("The named plaintiffs . . . all

10

have claims arising from the fraudulent scheme perpetrated by Prudential. That overarching scheme is the linchpin of [the complaint], regardless whether each class member alleges a churning claim, a vanishing premium claim, an investment plan claim, or some other injury.").

Moreover, the notice of settlement that was sent to Jemsek stated that the Love action involved allegations that Blue Cross was liable for, among other things, "Failing to pay for 'medically necessary' services in accord with member plan documents . . . [and] Concealing and/or misrepresenting the use of improper guidelines and criteria to deny, delay, and/or reduce payment for medically necessary covered services . . . ." (D.E. 1385, at 2). Those allegations, of which Jemsek had constructive knowledge, should have alerted him to the fact that the Love action substantially overlapped with his bankruptcy counterclaims.[1]

We hold that Dr. Jemsek's counterclaims and the Love action, both of which arise out of Blue Cross' conniving to deny, diminish, or delay payment for

---

[1] That language in the notice of settlement destroys Jemsek's argument that the notice of settlement in the Love action violated his due process rights. We have stated that to satisfy due process, a notice of settlement in a class action must inform the plaintiffs "whether claims like theirs were litigated in the earlier action." Adams, 493 F.3d at 1285–86 (alterations omitted). The class' claims "must be adequately described and the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." Id. (citing In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104–05 (5th Cir. 1977). After review of the full notice of settlement, we are satisfied that it is clear enough to satisfy due process.

11

covered services based on cost instead of medical necessity, share the same operative nucleus of fact. See Adams, 493 F.3d at 1289–91. The notice of settlement sent to Jemsek further provided him with fair notice that claims based on the same theory and factual predicate as his had been litigated and were being permanently settled. Accordingly, the district court did not err in finding that Jemsek's counterclaims were released by the settlement agreement after he failed to opt out.

## B.

Dr. Jemsek next contends that under Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), the Love action could not have certified Jemsek's claims for class treatment, and thus cannot preclude their separate pursuit. In Klay we allowed class certification for fraud-based RICO claims against health insurance companies, but refused to accept the certification of breach of contract actions brought against the companies. 382 F.3d at 1260, 1267. We held that although the insurance companies that withheld payments allegedly did so under many similar contracts and according to a general scheme, the common facts were "dwarfed by the individualized issues of fact to be resolved." Id. at 1264. In short, the various means that the companies allegedly used to breach the doctors' contracts were too different, and based on too many different medical-practice-specific procedures,

12

for class certification to be appropriate. Id. at 1263–67. Jemsek argues that Klay is the reason that his bankruptcy counterclaims were never explicitly certified for inclusion in the Love action, and that because they were excluded Love should not preclude them.

But "even when the court does not have power to adjudicate a claim, it may still approve release of that claim as a condition of settlement of an action before it." In re Corrugated Container Antitrust Litig., 643 F.2d 195, 221 (5th Cir. Apr. 1981) (alterations and quotation marks omitted);[2] see also Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 376–77 (1996). Given a broad enough settlement agreement— which it clearly was—and provided that Jemsek had notice of it and an opportunity to opt out, it is perfectly acceptable for the Love action to preclude his claims, even if they could not have been part of that action itself. See Matsushita, 516 U.S. at 376–77 ("[A] court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.") (quoting TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 460 (2d Cir. 1982)).

_____

[2] See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

13

## C.

Next, Dr. Jemsek contends that the district court's injunction against his counterclaims should not be enforced because it violated the automatic stay in his bankruptcy case. Jemsek argues that when he filed for bankruptcy in North Carolina in 2006, his bankruptcy estate, including his counterclaims against Blue Cross, were cemented into the bankruptcy case by the automatic stay issued under 11 U.S.C. § 362. Therefore, he argues, in the summer of 2007 when the Florida district court ordered that the notice of settlement be sent to Jemsek, it had no power over his counterclaims. According to Jemsek, the Florida district court could not force him to choose whether to opt out of the Love action because forcing him to make that choice improperly exercised control over his bankruptcy estate.

Under 11 U.S.C. § 362(a), filing for bankruptcy as Jemsek did operates as a stay against:

> [T]he commencement or continuation . . . of . . . [an] action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . [or] (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

14

11 U.S.C. § 362(a)(1–3). Under the plain language of the statute, Jemsek's counterclaims against Blue Cross are not "against the debtor," and thus were not subject to the automatic stay. See Crosby v. Monroe County, 394 F.3d 1328, 1331 n.2 (11th Cir. 2004) ("The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, does not extend to lawsuits initiated by the debtor."); Seiko Epson Corp. v. Nu-Kote International, Inc., 190 F.3d 1360, 1364 (Fed. Cir. 1999) ("The rule [§ 362(a)] . . . permits claims by the debtor and counterclaims to proceed."); Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1205 (3d Cir. 1991) ("Thus, within one case, actions against a debtor will be suspended even though closely related claims asserted by the debtor may continue. Judicial proceedings resting on counterclaims and third-party claims asserted by a defendant-debtor are not stayed. . ."). Therefore, the bankruptcy stay created by § 362 did not "cement" Jemsek's claims into his sealed estate and thereby shield them from the Florida district court's order in the Love action. Jemsek's counterclaims were not stayed, so there is no reason why the judgment in the Love action could not foreclose them. See Martin-Trigona v. Champion Fed. Sav. and Loan Ass'n, 892 F.2d 575, 577 (7th Cir. 1989) (stating that § 362(a) has "no policy of preventing persons whom the bankrupt has sued from protecting their legal rights.").

15

Nor did the Florida district court improperly "exercise control over property of the estate" under § 362(a)(3) by requiring Jemsek to choose whether to opt out of the <u>Love</u> action. Given that his counterclaims, though they may be "property of the estate," were not stayed by the automatic bankruptcy stay, they were open to possible defeat by Blue Cross' defenses. It would not make sense under a plain reading of the statute to treat raising a defense against a non-stayed counterclaim as an "exercise of control over property." <u>See</u> <u>Martin-Trigona</u>, 892 F.2d at 577 ("True, the bankrupt's cause of action is an asset of the estate; but as the defendant in the bankrupt's suit is not, by opposing that suit, seeking to take possession of it, [§ 362](a)(3) is no more applicable than (a)(1) is.").

Given that Blue Cross was free to defend against Jemsek's counterclaims, there is no reason to bar the Florida district court from simply <u>asking</u> Jemsek to make his own election about those counterclaims. <u>See</u> <u>In re Santangelo</u>, 325 B.R. 874 (Bankr. M.D. Fla. 2005). In <u>Santangelo</u>, as in this case, debtors in a bankruptcy proceeding failed to opt out of a class action and wound up bound by the class settlement order. We agree with the bankruptcy court's reasoning in <u>Santangelo</u>:

> What the District Court did do was give prospective class members, including the debtors, a choice; they could remain members of the class and be bound by the settlement or, instead, opt out of the class and separately

16

> pursue their claims. The District Court did not require the debtors to join in the class action. Rather, the District Court entered an order providing that class members would be bound by the settlement if they did not timely opt out of the class.
>
> . . . .
>
> Debtors holding claims as plaintiffs, like the debtors here, must play by the same rules of procedure as any other plaintiff. Debtors with claims involved in a class action suit must decide whether to remain in a class or opt out. The court administering a class action suit does not violate the automatic stay or exercise any control over the claim by requiring debtors to make this election. Nor is the stay violated because the debtors are now bound by the approved settlement. Again, no court and no party forced this result on the debtors or otherwise exercised control over their property.

Santangelo, 325 B.R. at 881. In short, the district court did not impermissibly exercise control over Jemsek's counterclaims simply by asking him whether he desired to opt out of the Love action. Therefore Jemsek remains bound by his decision not to opt out and by the judgment entered in the Love action.

**D.**

Finally, Dr. Jemsek contends that it was inequitable to enjoin his counterclaims. He asserts that it was unfair for Blue Cross to wait until the Love action had reached a final, binding settlement before it raised the possibility that the Love settlement could affect the bankruptcy suit in North Carolina. The district court adopted the magistrate judge's finding that Blue Cross' attempt to foreclose Jemsek's counterclaims was not inequitable, and instead that allowing Jemsek to pursue a double recovery by being a member of the Love class and also

17

retaining his counterclaims would be unfair. We review the district court's rejection of Jemsek's equitable defense for an abuse of discretion. See Sanders v. Dooly County, 245 F.3d 1289, 1291 (11th Cir. 2001).

Jemsek makes two equitable arguments: first, that laches bars Blue Cross from raising the Love settlement; and second, that because his counterclaims in the bankruptcy action were compulsory and triggered by Blue Cross' original lawsuit against him, it is unfair to allow Blue Cross to intentionally elicit, and then destroy, his claims. Neither of these arguments is convincing.

First, Jemsek raises his laches argument for the first time on appeal. "Arguments raised for the first time on appeal are not properly before this Court." Hurley v. Moore, 233 F.3d 1295, 1297 (11th Cir. 2000); see also Blue Cross Blue Shield of Alabama v. Weitz, 913 F.2d 1544, 1549 (11th Cir. 1990) (rejecting an equitable affirmative defense as untimely and waived when raised for the first time on appeal). We reject Jemsek's laches defense because he failed to raise it below.

Second, we fail to see why the compulsory nature of Jemsek's counterclaims makes it inequitable for Blue Cross to defend against them. If Jemsek wished to preserve his counterclaims, he could have done so quite easily by opting out of the Love action. As the magistrate judge observed, the inequitable result would be allowing Jemsek to pursue recovery in both the Love

action and his bankruptcy counterclaims.  The district court did not abuse its discretion in denying Jemsek's equitable defense against the injunction.

**AFFIRMED.**